IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CONNER V. HECHT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RACHEL E. CONNER, APPELLEE,

V.

EVAN J. HECHT, APPELLANT.

Filed March 11, 2025.    Nos. A-24-369, A-24-370.

Appeals from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Reversed and remanded with directions.

Francis E. Younes and Shakil A. Malik, of High & Younes, L.L.C., for appellant.

Steven M. Delaney and Megan E. Shupe, of Reagan, Melton & Delaney, L.L.P., for appellee.

MOORE, PIRTLE, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Evan J. Hecht appeals from a domestic abuse protection order entered against him by the district court for Sarpy County in favor of Rachel E. Conner. We determine the court erred in granting the protection order because the evidence does not demonstrate that Evan threatened Rachel with physical harm. Accordingly, we reverse the decision of the district court and remand the matter with directions to vacate the domestic abuse protection order.

## BACKGROUND

Evan and Rachel have known each other for approximately 6 years. They dated and lived together for several years and sometime around 2021 had a daughter, Maya. Rachel lives in La Vista, Nebraska, and Evan lives in Westfield, Iowa. But Evan works as a firefighter paramedic in

Des Moines, Iowa. His work schedule involves him working for 2 days and then having 4 days off. Evan and Rachel have never had an official custody plan for their daughter, but it became a routine for Evan to visit Maya in Nebraska after his 2-day shift was over. This often involved Evan staying at Rachel's house, but other times he would pick up Maya and Rachel's other child and take them to his farm in Westfield. He would then drop them off at Rachel's house before he was scheduled to work again.

On April 1, 2024, after several disagreements occurred over the course of several months related to Evan picking up Maya, Rachel filed a petition to obtain a domestic abuse protection order against him. In this petition, Rachel cited four incidents that occurred on November 4, 2023, November 12, 2023, January 29, 2024, and March 28, 2024. For the November 4 incident, Rachel alleged that Evan sent her friend a harassing text message. For the November 12 incident, Rachel alleged that Evan showed up at her home unannounced and became belligerent when she refused to let him take Maya and her son to his farm. For the January 29 incident, Rachel alleged that Evan's mother verbally abused Maya and was generally inappropriate in how she treated her.

For the March 28, 2024, incident, Rachel alleged that she was running errands when Evan called her wanting to pick up Maya. She stated that she told him she was busy, gave him the name of a store she was going to, and said that he could pick up Maya from a track meet she was attending later that afternoon. However, she specified that she did not tell him which of the store's location she was going to or where the track meet was being held. Nevertheless, Rachel alleged that Evan showed up at the store and after she quickly drove away, he followed her while yelling "Why are you stealing my daughter, what are you doing, your [sic] crazy." Rachel next alleged that Evan showed up at the track meet, barricaded her in a parking spot, and yelled at her through the car window. Because Evan had found her location several times that day, Rachel described how she went to the sheriff's office where they checked for and found a tracking device in her vehicle.

Based on these allegations, the court granted Rachel an ex parte harassment protection order on April 2, 2024. A hearing on Rachel's petition for a domestic abuse protection order was held on April 16. Rachel and Evan both testified at the hearing along with several individuals who were involved in the discovery of the tracking device and subsequent criminal investigation. Rachel only testified about filing the petition and that everything in it was true and correct. She also offered the petition as an exhibit, which was received into evidence. The remainder of the hearing consisted mostly of Evan's testimony.

Evan explained his side of the four incidents Rachel cited in her petition. He also offered, and the court received, several exhibits that contained text messages, phone records, and phone recordings between him and Rachel.

For the November 4, 2023, incident, Evan stated that he drove to Omaha so he could see his daughter before he had to work for 10 days. He said that Rachel got mad at him because he stopped in Lincoln to visit his brother and then accused him of being drunk. He testified that he had not consumed any alcohol that day, but Rachel still refused to let him see Maya. The text messages related to this incident display them arguing about Evan picking up Maya and Evan accusing Rachel of taking Maya to a house of someone she met online. In response, Rachel told him that she had not planned for him to pick up Maya that day and that he should go home. As they continued to argue over text messages, Rachel said that she had company over, and Evan

responded that her friend Mindy was not company. He then sent Rachel several messages that stated: "You shouldn't have involved [M]indy either. This is so fucking stupid. You had zero reason to do this. No reason to make an enemy today. So fucking dumb. Whatever comes next, you put in motion tonight. Good job." Around 30 minutes after those messages, Evan texted Mindy the following:

> [I don't know] what you two are doing but [R]achel lied about where the kids were and is refusing to let me see or take my daughter. This needs to stop. She does this every damn time she is mad.

> She has to stop using children as leverage.

> [I'm] not going to see my daughter for 10 days. This is kinda fucked up. I need to know where my daughter is.

> [By the way] . . . the silence . . . while being complicit in Rachel hiding my child . . . not smart.

After not being able to see Maya, Evan continued to text Rachel that night and called her 9 times between 6:42 p.m. and 8:50 p.m. In some of these messages Evan continued to accuse Rachel of taking Maya to a stranger's house and the following colloquy occurred over text:

> [Evan]: Show me [Maya is] at home in her bed and not at some stranger[']s house. That['s] all I want.

> [Rachel]: You're going to try and kill me aren't you[?]

> [Evan]: No dumbass. If I wanted to kill you, you['d] be dead[.]

Rachel then accused Evan of sending someone to her house to watch her, which he denied several times. Also, throughout these messages, Evan called Rachel a "Twat," "Roach," "Pyscho," and "Cunt."

For the November 12, 2023, incident, Evan testified that he showed up at Rachel's house to pick up Maya and Rachel's other son. He testified that everything was fine and both children were in his car when he and Rachel started arguing. Rachel then changed her mind about letting the children go with him and started pulling them out of his vehicle. Evan said that he did not prevent her from doing this and did not remember why her behavior changed.

The court disregarded the allegations regarding the January 29, 2024, incident involving Evan's mother's treatment of Maya because they dealt with the behavior of Evan's mother, not him.

For the March 28, 2024, incident, Evan explained that he drove to Omaha to pick up Maya as he normally did after he finished his 2-day shift. Once he was in town, he Facetimed Rachel around 12:10 p.m. and told her that he was going to come get Maya. Rachel was surprised that Evan was in town and told him that she was busy running errands. They then sent several text messages where Rachel told Evan that he needed to let her know when he planned to pick up Maya. She also told him that she was taking Maya to a track meet later that afternoon. Despite this, Evan still requested they set a meeting location so he could pick her up.

At 12:40 p.m., Evan called Rachel and Rachel told him that she was leaving Bigwheels 2 Butterflys ("Bigwheels"), which is a consignment store with multiple locations. She did not specify which location she was at but stated only one location took clothing that day. She then said she

was going to run some more errands before returning to Bigwheels in 45 minutes. Evan and Rachel then argued about where he was planning to take Maya and when she would be back. During this discussion, Rachel told Evan that Maya wanted to go to the track meet which was at 1:15 p.m. After they argued more about where he was going to take Maya, Rachel told Evan that she was not going to his farm. Evan responded that he was not going to the farm and expressed frustration about Rachel unilaterally making rules regarding when and where he could take his daughter. After Rachel abruptly hung up, they continued to exchange text messages.

After several text messages where Evan continually requested a meeting place to pick up Maya and accused Rachel of avoiding him, Rachel told him that he could meet them at the track meet. Evan told her that he did not know where that was and wanted to meet somewhere else. Rachel told him that she was going to pick up her clothes from another store and then go to Bigwheels. In response, Evan said, "Ok lets [sic] meet at one of those." Because he did not know which Bigwheels location Rachel was going to, he called two locations to find out which one was taking clothes that day. Once he figured that out, he drove to the store and waited for Rachel to arrive.

Once Rachel arrived at Bigwheels, she saw Evan waiting and drove away. Evan followed her in his vehicle in an attempt to make contact but stopped once Rachel started driving erratically. During this encounter Evan called Rachel, and she accused him of putting a tracker in her car. Evan denied this and told her that she told him where she was going to be. Evan continued to request that she pull over so he could pick up Maya, but Rachel told him that Maya did not want to go with him. They argued more about where Evan was going to take her, and Evan accused her of withholding Maya from him. After this phone call, Rachel sent Evan a text message asking him how he found her and accused him of tracking her location. She also told him to stop following her and that he was scaring her and the kids. Evan responded by saying that she was "blatantly withholding" and "hijacking" Maya.

Evan then went to the track meet where he confronted Rachel. He videotaped the encounter which displays him standing outside of Rachel's vehicle and asking her why she would not let him have Maya. After Rachel and Maya did not respond for about a minute and a half, Evan left. The video also depicted Evan's vehicle parked behind Rachel's which prevented her from leaving the parking spot. Rachel and Evan continued to argue over text messages and Evan informed her that he learned where the track meet was by looking it up online. He also sent her a screenshot of the website that showed where the track meet was. Evan sent her several more messages later that night and the next day, but Rachel never responded.

During cross-examination, it was revealed that Evan was previously convicted of a criminal offense against Rachel. While the dates of the incident and conviction were not discussed, Evan stated that he was originally charged with strangulation but pled to one count of disturbing the peace.

Rachel then called five witnesses who either worked for Sarpy County or the Sarpy County Sheriff's Office. These witnesses generally outlined how she requested they search her vehicle for a tracker, and how they found it. Multiple of these witnesses explained that it appeared the tracker was professionally installed because it was well secured to the steering column. And although they were not aware of who had placed the tracker at the time of the hearing, prior to the issuance of the protection order, it was discovered that the previous owner of the vehicle installed the device.

On April 24, 2024, the court issued an order granting Rachel's petition for a domestic abuse protection order. In this order the court found that Rachel was more credible than Evan and explained how Evan's anger manifested itself throughout the hearing. The court described how Evan's tone and tenor expressed anger and how he slammed his paperwork down when he left the witness stand and when he returned to the counsel's table. But the order also noted that Evan's anger regarding the tracker was understandable given the revelation that he was not involved in its installation. The court then stated:

> [Evan] repeatedly and aggressively contacted and followed [Rachel] throughout the day despite her requests to cease. [Evan's] reason for doing so was to see his daughter. While there is some legitimacy to his reason, this is outweighed by a proper course of action is [sic] to seek relief in CI20-2166 to enforce his "rights". Rather than do this, he has relied on self-help measures which are not appropriate and are overbearing on [Rachel].
>
> . . . .
>
> In his actions and his communication, [Evan] berates, degrades, and makes threats to [Rachel]. For example, he calls [her] a "cunt", a "roach", a "dumbass", and a "twat". He states "If i wanted to kill you, you'd be dead". He incessantly contacts [Rachel] despite her request to stop. The Court finds [Rachel's] fear for her safety is reasonable and justified. She has been the victim in a prior incident between the parties.

The court then found that Evan's actions met the definition of abuse under Neb. Rev. Stat. § 42-903(c) (Supp. 2023). As a result, Evan was ordered to stay away from Rachel's home and place of work and was prohibited from contacting her.

Following the grant of the domestic abuse protection order, it appears that the district court gave the proceedings a new case number. When Rachel filed her petition and the ex parte harassment protection order was issued, the case was numbered as CI 24-548. But upon the issuance of the domestic abuse protection order, the case was transferred to CI 24-721. This was presumably done due to the change in the type of protection order. Nevertheless, because there are two case numbers associated with these proceedings, Evan appealed from both cases, and we have consolidated the appeals for purposes of our review.

## ASSIGNMENTS OF ERROR

Restated and separated, Evan assigns the district court erred by (1) issuing the initial ex parte harassment protection order and (2) granting Rachel's petition for the domestic abuse protection order.

## STANDARD OF REVIEW

The grant or denial of a protection order is reviewed de novo on the record. *Diedra T. v. Justina R.*, 313 Neb. 417, 984 N.W.2d 312 (2023). In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the district judge heard and observed the witnesses and accepted one version of the facts rather than another. *Rachel C. on behalf of Clayton R. v. Amos R.*, 32 Neb. App. 473, 1 N.W.3d 528 (2023).

ANALYSIS

Before reaching the merits of the parties' arguments, we briefly review the law governing show cause hearings and protection orders. Harassment protection orders are governed by Neb. Rev. Stat. § 28-311.09 (Cum. Supp. 2024). Domestic abuse protection orders are governed by Neb. Rev. Stat. § 42-924 et seq. (Supp. 2023). A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Diedra T. v. Justina R., supra.* A protection order is analogous to an injunction, and a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle that party to relief. *Id.* As such, the petitioner at a show cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. *Id.* Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect. *Id.* A prima facie case supporting issuance of a harassment protection order may be established by a form petition and affidavit, but the petition and affidavit cannot be considered as evidence until offered and accepted at the trial as such. *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010).

A trial court has discretion, authority, and jurisdiction to issue a harassment protection order, even though the petitioner had filed a petition for a domestic abuse protection order. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014). But the legal theory supporting a domestic abuse protection order is significantly different from the theory underlying a harassment protection order. *Id.* This is because the former requires proof of "abuse" as specifically defined by the Legislature in Neb. Rev. Stat. § 42-903(1)(b). See *Linda N. v. William N., supra.*

EX PARTE HARASSMENT PROTECTION ORDER

Evan first assigns the district court erred in granting the ex parte harassment protection order because Rachel failed to meet her burden to prove the truth of the facts alleged.

We first note the district court could not have erred in granting the ex parte harassment protection order in the way Evan asserts. Section 28-311.09 states that "Any order issued under subsection (1) of this section may be issued ex parte without notice to the respondent if it reasonably appears from the specific facts shown by affidavit of the petitioner that irreparable harm, loss, or damage will result before the matter can be heard on notice." In this regard, the district court was in no position to determine whether Rachel satisfied her burden to prove the truth of her allegations when it issued the ex parte harassment protection order. At that point in the proceeding, the court could only determine whether Rachel's allegations made it reasonably appear that she would suffer irreparable harm, loss, or damage before a show cause hearing could be held. Only after the show cause hearing could the court determine whether Rachel proved the truth of her allegations. Accordingly, Rachel did not bear the burden of proving her allegations when the court issued its ex parte harassment protection order, and the court did not err in issuing it.

However, even if Evan's assignment of error did not suffer from this fatal flaw, any error in issuing the ex parte harassment protection order became moot upon the court's issuance of the domestic abuse protection order. A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *Prentice v. Steede*, 28 Neb. App. 423, 944 N.W.2d 323 (2020). Since an ex parte harassment

protection order is a temporary order, see §§ 28-311.09(6), (9)(a), and (c), the issue of whether the court erred in entering the ex parte order was relevant only from the time the order was entered until it was replaced by the final order after the show cause hearing. See *Prentice v. Steede, supra.* Therefore, any issue relating to the ex parte order is moot and need not be resolved in this appeal. See *id.*

DOMESTIC ABUSE PROTECTION ORDER

Evan next assigns the district court erred in granting the domestic abuse protection order because there was insufficient evidence that he abused Rachel under the statutory definition.

Section 42-924 of the Protection from Domestic Abuse Act permits "[a]ny victim of domestic abuse" to file a petition and affidavit for a protection order. Whether domestic abuse occurred is a threshold issue in determining whether an ex parte protection order should be affirmed; absent abuse as defined by § 42-903, a protection order may not remain in effect. See, § 42-903; § 42-924; Neb. Rev. Stat. 42-925 (Cum. Supp. 2022); *Maria A. on behalf of Leslie G. v. Oscar G.*, 301 Neb. 673, 919 N.W.2d 841 (2018). The Act defines "abuse" in pertinent part as follows:

> (a) Attempting to cause or intentionally and knowingly causing bodily injury[;]
> (b) Placing, by means of credible threat, another person in fear of bodily injury[;]
> or
> (c) Engaging in sexual contact or sexual penetration without consent[.]

§ 42-903(1). A "credible threat" is defined by § 42-903(1)(b), as:

> [A] verbal or written threat, including a threat performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the person making the threat had the intent to actually carry out the threat.

In *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014), the Nebraska Supreme Court reversed the issuance of a domestic abuse protection order after finding that the respondent's conduct did not fit within the statutory definition of abuse under § 42-903(1). In this case, the protection order was entered on behalf of the respondent's 16-year-old daughter after he sent her a variety of crude text messages. In these messages, he called his daughter's mother a "drunk" and "piece of loser shit," his daughter's mother's boyfriend a "fag" and "pussy," and his daughter "an asshole." *Linda N. v. William N.*, 289 Neb. at 609, 856 N.W.2d at 440. More so, he told his daughter that she could "kiss [his] ass" and that she "will one day regret all of [her] sick rude twisted desgusting [sic] ignorant shit." *Id.*

While the Court acknowledged that these "crude" messages were "morally abhorrent," it noted that none of the respondent's messages referenced or threatened physical harm. *Id.* at 614, 856 N.W.2d at 443. It then determined the "credible threat" language within § 42-903 requires the evidence at trial include some threat of intentional physical injury or any other physical threat. See

- 7 -

*Linda N. v. William N., supra.* With this requirement, the lack of physical threat, and no history of past physical abuse, the court concluded that the respondent's conduct did not fit within § 42-903(1)'s statutory definition of abuse and reversed the issuance of the domestic abuse protection order.

In the current matter, Rachel cites several specific incidents where Evan threatened her or displayed a pattern of threatening behavior that put her in fear of bodily injury. She points to Evan's prior criminal conviction, her allegation that he sent someone to her house on November 4, 2023, his message from November 4 where he stated, "If I wanted to kill you, you[']d be dead," and his actions on March 28, 2024. For the March 28 incident, she claims that Evan's conduct constituted a pattern of threatening behavior because he followed her through traffic, barricaded her car, yelled at her, and threatened her.

We determine the current matter is similar to *Linda N. v. William N., supra.* Although Evan sent Rachel a series of rude messages, called her abhorrent names, and behaved inappropriately on several occasions, his conduct does not meet § 42-903(1)'s statutory definition of abuse because he never threatened Rachel with intentional physical injury. Some of Evan's actions may have been purposefully intimidating, but in the absence of an actual threat, his conduct cannot be considered abuse under the statutory definition. See *Linda N. v. William N., supra.*

For the events that happened on November 4, 2023, Evan was accusing Rachel of hiding Maya when Rachel suddenly asked, "You're going to try to kill me aren't you." Evan responded with "No dumbass. If I wanted to kill you, you[']d be dead." While these messages and corresponding phone logs indicate that Evan's consistent attempts to contact Rachel may have been upsetting, the messages do not convey any threat of physical harm. In fact, there was no mention of violence before Rachel invoked the possibility by asking Evan if he was going to kill her. More so, Evan explicitly denied the threat of harm when he responded with "No dumbass."

Then later that night, Evan sent Rachel several text messages where he said, "Heyyy thought it was bedtime," "You had company over you said," and "You took the kids on a double date?" Rachel essentially alleges that Evan learned about these things by watching her house or sending someone else to watch her. She now cites these messages as further examples of Evan's pattern of domestic abuse. But like the prior messages, nothing in these texts threatened physical harm. More so, nothing in the record indicates that Evan correctly identified what Rachel was doing that night. It would certainly be more concerning if Rachel did in fact go on a double date or had company over because it would better suggest that Evan was in fact watching her. However, without any evidence concerning the accuracy of these messages, Evan's repeated denials that he or someone else was watching Rachel, and the lack of a physical threat, we cannot say that these messages constituted abuse.

Similarly, Evan never threatened physical harm against Rachel during the events of March 28, 2024. Rachel contends that Evan following her throughout the day, barricading her car, and yelling at her demonstrated a pattern of threatening behavior. However, a review of the record shows that Rachel told Evan where she was going to be and the approximate time she was going to be there throughout the day. More specifically, Rachel told Evan she was going to Bigwheels, that she would be there in approximately 45 minutes, and that only one location was taking clothes that day. After this, Evan mentioned potentially meeting there to exchange Maya, which was what he was trying to do throughout the entire ordeal. Likewise, Rachel told Evan that he could meet

them at the track meet and told him it started at 1:15 p.m. Evan then used this information to look up the location online. We acknowledge that it may have been unnerving for Rachel when Evan showed up at both locations, but we cannot say that any of his actions constituted physical threats.

Likewise, we cannot determine that Evan physically threatened Rachel when he confronted her in the parking lot. While the video displays Evan's vehicle parked behind hers, at no point did he threaten physical harm against her. Instead, he asked her why she was not letting him take Maya and then left after around a minute and a half of her not responding.

In our analysis, we do not ignore Evan's prior criminal conviction for an offense against Rachel. The remoteness of past abuse may be considered by the court in deciding whether a protection order is warranted and that a remote incident of abuse may not always support the issuance of a domestic abuse protection order. *Sarah K. v. Jonathan K.*, 23 Neb. App. 471, 873 N.W.2d 428 (2015). However, we have almost no information regarding Evan's conviction. The record is silent as to when it occurred and what exactly happened. The only information we have is that Evan was originally charged with strangulation, but later pled to disturbing the peace. With barely any information regarding this conviction and no reference to when it occurred, we are unable to determine the remoteness of the incident and cannot give it much weight.

Like the Supreme Court noted in *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014), Evan's conduct and messages were often abhorrent, troublesome, and potentially harassing. But as the district court noted, his anger was not entirely illegitimate as he was being denied access to his daughter after having a consistent visitation routine for several years. In addition, as it was later revealed, he was being falsely accused of placing a tracker in Rachel's vehicle. And although we give weight to the district court's finding that Rachel was more credible than Evan, we cannot say that the evidence supports the court's decision that Evan abused Rachel under the statutory definition. Where there is no threat of harm to the petitioner, a domestic abuse protection order is not appropriate. See *Linda N. v. William N., supra.* Because the evidence did not demonstrate that Evan ever physically threatened Rachel, we determine that a domestic abuse protection order was not warranted under the circumstances. Therefore, we reverse the decision of the district court.

CONCLUSION

The district court incorrectly granted a domestic abuse protection order, because Evan's conduct did not fit within the statutory definition of "abuse" under § 42-903(1). We reverse the judgment of the district court and remand the cause with directions to vacate the domestic abuse protection order.

REVERSED AND REMANDED WITH DIRECTIONS.